**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
IN RE AGAPE LITIGATION

This Document Relates to: All Actions
-----------------------------------------------------------X
-----------------------------------------------------------X
ADRIANNE CLARKE, TL HORIZONS LLC,
MAXIMILIAN ENTERPRISES LLC and EQUITY
TRUST COMPANY CUSTODIAN fbo Adrianne
Clark IRA,

                    Plaintiffs,

          -against-

NICHOLAS COSMO, AGAPE WORLD INC.,
AGAPE MERCHANT ADVANCE LLC, AGAPE
WORLD LLC, ANTHONY MASSARO, DAVID
PETRY, HUGO LEON ARIAS, SEBASTIAN
TAUZ, MARTY HARTMANN, SR., MARTY
HARTMANN, JR., ELIZABETH (last name
unknown), LAURIE SAVARESE, BANK OF
AMERICA, N.A., ALARON TRADING
CORPORATION d/b/a ALARON FUTURES &
OPTIONS, XYZ CORPS 1-10, JOHN DOE 1-10,
JANE DOE 8A, COMPANY 1, COMPANY 2, and
JOHN DOES 11-200,

                    Defendants.

  -----------------------------------------------------------X-
-----------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**

Master File No: 09-CV-1606
(ADS)(AKT)

09-CV-1782 (ADS)(AKT)

**APPEARANCES:**

**Robbins Geller Rudman & Dowd LLP**
Attorneys for the Class Action Plaintiffs
58 South Service Road, Suite 200
Melville, NY 11747
          By:  Edward Y. Kroub, Esq.
                    Robert M. Rothman, Esq., Of Counsel

**Law Offices of Christopher J. Gray, P.C.**
Attorneys for the Class Action Plaintiffs
460 Park Avenue, 21st floor
New York, NY 10022

By: Christopher J. Gray, Esq., Of Counsel

**Louis F. Burke P.C.**
Attorneys for the Class Action Plaintiffs
460 Park Avenue, 21st Floor
New York, NY 10022
By: Louis F. Burke, Esq., Of Counsel

**Zamansky & Associates**
Attorneys for the Class Action Plaintiffs
50 Broadway, 32nd Floor
New York, NY 10004
By: Edward H. Glenn, Jr., Esq.
Jacob H. Zamansky, Esq.
Kevin Dugald Galbraith, Esq., Of Counsel

**Edward K. Blodnick & Associates, P.C.**
Attorneys for the Clarke Plaintiffs
1205 Franklin Avenue, Suite 110
Garden City, NY 11530
By: Edward K. Blodnick, Esq., Of Counsel

**Tacopina & Siegel, PC**
Attorneys for Defendant Anthony Massaro
275 Madison Avenue, 35th Floor
New York, NY 10016
By: Chad D. Siegel, Esq., Of Counsel

**Law Office of Ira S. Newman**
Attorneys for Defendant Sebastian Tauz
98 Cutter Mill Road, Suite 441 South
Great Neck, NY 11021
By: Ira S. Newman, Esq., Of Counsel

**Law Offices of Howard E. Greenberg, P.C.**
Attorneys for Defendants Marty Hartmann, Sr. and Marty Hartmann, Jr.
180 East Main Street, Suite 308
Smithtown, NY 11787
By: Howard E. Greenberg, Esq., Of Counsel

**Arnold & Porter LLP**
Attorneys for Defendant Bank of America, N.A.
399 Park Avenue
New York, NY 10020-4690
By: Michael D. Schissel, Esq.
Erik Christopher Walsh, Esq.
Pamela Addison Miller, Esq., Of Counsel

**SPATT, District Judge**.

Investors in a Ponzi scheme orchestrated by Nicholas Cosmo ("Cosmo") through Agape Merchant Advance LLC, Agape World Bridges, LLC, and Agape World Inc. (collectively "Agape") commenced these two cases, In re Agape Litigation, 09-CV-1606 (the "Class Action Plaintiffs") and Clarke v. Cosmo, 09-CV-1782 (the "Clarke Plaintiffs" and together with the Class Action Plaintiffs "the Plaintiffs"), against various defendants alleged to be complicit in the fraudulent scheme. One of the defendants named in the originally filed first amended complaints in both actions (the "Initial Complaints") was Bank of America, N.A. ("BOA"). The Plaintiffs contend that BOA aided and abetted Cosmo and Agape in orchestrating the fraud and breaching their fiduciary duties to investors.

In In re Agape Litigation ("Agape I"), 681 F. Supp. 2d 352 (E.D.N.Y. 2010), this Court dismissed the claims asserted in the Initial Complaints against BOA. However, the Court afforded the Plaintiffs an opportunity to amend their complaints as against BOA with respect to the causes of action for aiding and abetting fraud and aiding and abetting breach of fiduciary duty. In accordance with the Court's rulings in Agape I, on March 31, 2010 the Class Action Plaintiffs filed a second amended complaint (the "SAC"), and on April 6, 2010 the Clarke Plaintiffs filed a second amended complaint (the "Clarke SAC" and together with the SAC the "Second Amended Complaints"). The Second Amended Complaints assert claims against BOA for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and aiding and abetting conversion.

Presently before the Court is BOA's motion to dismiss the Second Amended Complaints in their entirety for failure to state a claim under Federal Rule of Civil Procedure 12(b) and for

failure to plead with specificity under Federal Rule of Civil Procedure 9(b). For the reasons set forth below, the motion is granted in its entirety.

## I. BACKGROUND

### A. The Ponzi Scheme Operated by Nicholas Cosmo

The allegations in the Second Amended Complaints with respect to the nature of the Ponzi scheme are substantively identical to those stated in the Initial Complaints. The Court summarized the factual background of the Ponzi scheme in Agape I as follows:

> On January 15, 1999, this Court sentenced Cosmo to 21-months imprisonment and three years of supervised release after he pleaded guilty to fraud. As a result of his conviction, Cosmo, then a stock-broker, was stripped of his license to deal securities and was barred from associating with any investment broker-dealer. Not long after completing his term of supervised release, Cosmo formed Agape World, Inc. ("Agape").

> From October of 2003 through his most recent arrest in January of 2009, Cosmo devised and orchestrated a Ponzi scheme through Agape and various other entities under his control. Agape held itself out as a company that provided short-term bridge loans to businesses and individuals that were unable to obtain financing from commercial banks. Through direct solicitation and various brokers, Agape was able to raise an estimated $400 million by promising investors enticing short-term returns of 12 to 15%.

> In actuality, although Agape received approximately $400 million from investors between October of 2003 and January of 2009, the company made only approximately $25 million in loans. Large returns paid to early investors simply came from money paid by subsequent investors. Cosmo used the investments to finance a lavish lifestyle and pay Agape brokers handsome commissions for soliciting new investors. In order to compensate for the lack of revenue from legitimate loans, Cosmo used investor money to make risky bets in the commodities market. In the process, he lost approximately $80 million.

681 F. Supp. 2d 352, 357 (E.D.N.Y. 2010). Subsequent to the Court's decision in Agape I, on October 29, 2010, Cosmo pled guilty in a criminal proceeding to eleven counts of mail and wire fraud. See United States v. Cosmo, 09-CR-255, Docket # 98 (E.D.N.Y. Oct. 29, 2010).

**B.  Allegations against Bank of America in the Initial Complaints**

In the Initial Complaints, the Plaintiffs primarily focused on suspicious activity in the Agape accounts and the existence of what they referred to as the "Agape Branch" to support their contention that BOA knowingly aided and abetted the Agape Ponzi scheme and thus contributed to the Plaintiffs' injuries.  According to the Plaintiffs, BOA established an "Agape Branch" at Agape's headquarters in Hauppauge, New York.  BOA staffed the Agape Branch with an unnamed BOA employee, and occasionally additional unnamed BOA representatives  The staff had full access to BOA's systems and possessed the ordinary capabilities of a conventional BOA branch.  In addition to describing the services provided at the Agape Branch, the Plaintiffs cited to two specific examples of occasions where the BOA employee(s) at the Agape Branch provided substantial assistance to the fraud.

First, on December 24, 2008, an unnamed investor went to the Agape offices and demanded that Agape return his $200,000 investment.  An unnamed broker, acting on the investors behalf, approached Cosmo about returning the money, and was directed to the BOA employee at the Agape Branch.  At Cosmo's request, the BOA employee issued to the investor a check for $162,500, which was then signed by Cosmo and delivered to the investor.  Second, the Plaintiffs alleged that at some point, Cosmo informed an unnamed broker that an investor's withdrawal request was delayed because Agape was waiting for a $28 million payment from BOA in connection with a project in Maine.  When the unnamed broker approached a BOA representative, he was told the payment had not yet been made, but was not told that the scheduled payment was actually for $1 million.

With respect to Agape's account activity, the Initial Complaints stated that a review of Agape's 13 BOA accounts:

> would have shown that Agape utilized the investor deposits it
> received for: (a) Its own operating expenses including lucrative
> payments to its referring brokers; (b) wires and transfers totaling
> $100 million or more out to the FCMs for speculation in the
> commodities market; (c) payments to Cosmo for his own lavish
> personal expenses; and (d) the issuance of interest payments or
> redemptions to investors.

(Class Action Compl., ¶ 70.) Accordingly, with this knowledge, the Plaintiffs asserted that BOA substantially assisted the facilitation of the fraud by: (1) allowing Cosmo, who was a convicted felon, to open, direct, control and have access to at least two dozen accounts under different names; (2) enabling Cosmo and Agape to transfer investor funds from 12 separate named accounts into one main account and commingle investor money with no segregation by name or bridge loan; (3) sharing proprietary customer account information with Agape to help them solicit investors; (4) regularly approving and advancing wire transfers of up to $100 million to commodities and futures trading firms; and (5) lending its name, reputation, and endorsement to Agape.

Based on these factual allegations, the Plaintiffs asserted claims against BOA for aiding and abetting commodities fraud; aiding and abetting common law fraud; aiding and abetting breach of fiduciary duty; and negligence. In addition, the Clarke Plaintiffs alleged that BOA violated provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO").

## C. The Decision Dismissing the Initial Complaints Against Bank of America

The Court's decision in Agape I, among other issues, addressed BOA's motion to dismiss the above stated causes of action. The Court dismissed the negligence claim because the Plaintiffs "failed to allege that BOA breached a cognizable legal duty" and dismissed the aiding and abetting commodities fraud claim for lack of standing. 681 F. Supp. 2d at 361, 368–69. In

addition, the Court dismissed the RICO claim because the allegations were "insufficient to show that BOA directed or operated Cosmo's scheme." Id. at 369–70.

With respect to the causes of action for aiding and abetting fraud and aiding and abetting a breach of fiduciary duty, the Court dismissed the claims. The Court held that the Plaintiffs had not plausibly alleged that BOA had actual knowledge of the underlying fraudulent scheme or had rendered substantial assistance to the underlying scheme. The specifics of this decision are discussed in greater detail in the discussion portion of this opinion. With respect to granting leave to amend the aiding and abetting causes of action, the Court stated as follows:

> Although the Court has serious doubts about whether the Plaintiffs can offer factual allegations that would give rise to the strong inference that BOA had actual knowledge of or provided substantial assistance to Cosmo's scheme, the Court will afford the Plaintiffs one opportunity to amend only these two claims. Accordingly, the Court grants the Plaintiffs leave to file amended pleadings for the limited purpose of adding or amplifying factual allegations that bear on their claims against BOA for aiding and abetting fraud and aiding and abetting a breach of fiduciary.

Id. at 371.

## D.  The Allegations Against Bank of America in the Second Amended Complaints

In accordance with the Court's ruling in Agape I, the Plaintiffs filed the Second Amended Complaints. Aside from the section describing the nature of the Ponzi scheme, the two complaints include almost identical allegations. However, both the Class Action Plaintiffs and the Clarke Plaintiffs failed to follow the Court's instructions with respect to amending the complaint. In particular, the Clarke Plaintiffs included the same RICO claims that this Court dismissed in Agape I with prejudice, and both the Class Action Plaintiffs and the Clarke Plaintiffs added a new cause of action for aiding and abetting conversion. The Court will not revisit the previously dismissed RICO claims, and later in this decision, the Court will address the propriety of adding a new cause of action for aiding and abetting conversion.

According to the Plaintiffs, the Second Amended Complaints are the result of a "renewed and tireless factual investigation informed by thousands of pages of banking records recently obtained from the Court-appointed Bankruptcy Trustee." (Pls.' Mem. at 3.) In the Second Amended Complaints, the Plaintiffs provide additional factual detail to the previously pled allegations with respect to the "Agape Branch", including identifying the previously "unnamed" BOA employee as Rebecca Campagnuolo ("Campagnuolo"), and alleging that: (1) at some point in late 2008 she became the de facto Controller of Agape; (2) she made false representations to investors to prevent them from removing their money from Agape; and (3) between December 2007 and March 2008 Agape made payments totaling $32,120.68 to Campagnuolo's husband, Anthony Campagnuolo. In addition, the Plaintiffs amplified their allegations with respect to the pattern of activity in the Agape accounts by providing a chart showing that the monthly withdrawals, deposits, and balances for the main Agape account from June 2006 until January 2009 are consistent with a Ponzi scheme and inconsistent with a company purporting to provide bridge loans.

Furthermore, the Plaintiffs added new categories of factual allegations with respect to: (1) initial due diligence that BOA performed in association with opening the Cosmo and Agape accounts and BOA's extension of personal and commercial lines of credit to Cosmo and Agape; (2) BOA's role in structuring and monitoring Agape and Cosmo's accounts; and (3) actual reports about Agape's fraud from an unnamed investor to BOA Vice President Gregory Bowes and the Office of the Controller of the Currency. The following facts from the Second Amended Complaints set forth the basis for the Plaintiffs allegations with respect to BOA's due diligence and role in structuring and monitoring the Agape and Cosmo accounts.

### 1. Initial Due Diligence

In October of 2003, shortly after completing a twenty-month prison sentence for felony investor fraud, Cosmo applied for a bank account with BOA's predecessor Fleet Bank. As part of the industry's "Know-Your-Customer" rules, Fleet conducted a background check of Cosmo and learned: (1) that Cosmo had a recent felony conviction; (2) that he purported to run a financial firm; and (3) that his business would be located in Long Island, which has been designated under federal law as a "high-impact area" for financial crimes. (SAC ¶ 34, Clarke SAC ¶ 134.) The existence of these factors triggered "Enhanced Due Diligence" and required Fleet to fulfill the requirements of its "Customer Identification Program". (SAC ¶ 35; Clarke SAC ¶ 135.) Subsequently, at an unidentified date in 2006, BOA extended personal and commercial lines of credit to Cosmo and Agape. In conjunction with providing this credit, BOA conducted due diligence into the source of Cosmo's assets and the nature of Agape's business. This due diligence revealed "a lack of any legitimate business enterprise and the illegality of the scheme" and provided BOA with "actual knowledge" of Agape's fraud. (SAC ¶ 38; Clarke SAC ¶ 138.)

### 2. BOA's Role in Structuring and Monitoring Agape and Cosmo's Accounts

Tom Sullivan ("Sullivan"), a Senior Client Manager within the Business Banking Department was the BOA account representative assigned to the Cosmo and Agape accounts. In this capacity, Sullivan had frequent lunch meetings with Cosmo, where they discussed the nature of Agape's business and the account activity. At an unidentified time, Sullivan recommended to Cosmo that Agape utilize an account structure that included one main operating account and twelve sub-accounts (the "Agape account structure"). Subsequently, Cosmo structured the Agape accounts consistent with Sullivan's recommendation. However, instead of segregating

investor funds in the sub-accounts, at the end of each day, Agape would "sweep" all of the funds into the main operating account.  According to the Plaintiffs, the Agape account structure "facilitated the rapid flow of funds into the scheme and allowed Cosmo to quickly ramp up the scheme's revenues."  (SAC ¶ 60; Clarke SAC ¶ 160.)

Furthermore, beginning in June 2006, BOA began charging Agape an "account management fee" to "actively monitor[] and analyze[] Agape's network of accounts."  (SAC ¶ 39; Clarke SAC ¶ 139.)  At first this fee was charged quarterly, but at an unidentified time BOA began charging this fee monthly.  Although it is unclear from the Second Amended Complaints what was involved in monitoring and analyzing the Agape accounts, over the course of time BOA received a total of $70,000 for providing this service.  In addition to the quarterly and then monthly account monitoring, BOA also monitored the Agape account activity on a day-to-day basis through a computer system known as "Connection", which provided Sullivan with daily updates regarding major deposits and wire transfers in the Agape accounts.  In addition, client wire transfers for more than $10,000 were required to be approved by either Sullivan or another officer of BOA and Agape wired funds greater than $10,000 several times each month. According to the Plaintiffs, BOA's frequent review of the Agape account activity "leads to one inference and one inference alone:  Agape was running a Ponzi scheme . . . and Bank of America knew it."  (SAC ¶ 1; Clarke SAC ¶ 1.)

Finally, in March 2008, Sullivan recommended to Cosmo that Agape seek to obtain a Bank of America Remote Depository System ("RDS").  An RDS is a service that allows commercial customers to deposit large batches of checks from their own headquarters in order to enable more efficient handling of high-velocity deposits.  (SAC ¶ 62; Clarke SAC ¶ 162.)  In order to obtain the RDS, Agape had to be recommended by a BOA employee.  After receiving

the recommendation from Sullivan, BOA officials conducted an extensive internal review in order to assess Agape's fraud risk. BOA also had the option to conduct an audit in association with the approval process, but declined to exercise that option. According to the Plaintiffs, in addition to "telltale signals" of fraud, this review process had to reveal that:

> Cosmo was a felon convicted of financial fraud, now running a financial firm; Agape's operating account simply acted as a pass-through, with <u>billions</u> of investor dollars coming in and going out to fund Cosmo's commodities trading habit, pay brokers outlandish commissions, pay "interest" to early investors and to fund the lifestyles of himself, his family and his associates; and its escrow account sat empty despite consistent claims to the investing public and to Sullivan that Agape funded loans for discrete construction projects.

(SAC ¶ 67; Clarke SAC ¶ 167 (emphasis in original).) Despite this information, Agape received the required approval for the RDS by Sullivan and multiple BOA risk officers. The Plaintiffs contend that the RDS "enabled the fraud to grow stronger, work more efficiently and further defraud innocent investors." (SAC ¶ 68; Clarke SAC ¶ 168.)

Based on the amplified and new factual allegations in the Second Amended Complaints, the Plaintiffs contend that they have plausibly alleged that BOA aided and abetted Cosmo and Agape in the facilitation of the Ponzi scheme.

## II. DISCUSSION

### A.  Legal Standard

A Rule 12(b)(6) motion to dismiss is reviewed under the <u>Twombly</u> plausibility standard, where a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). The Second Circuit held that, after <u>Twombly</u>, the Court's inquiry under Rule 12(b)(6) is guided by two principles. <u>Harris v. Mills</u>, 572 F.3d 66 (2d Cir. 2009) (citing <u>Ashcroft v. Iqbal</u>, --- U.S. ----, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" Id. (quoting Iqbal, 129 S. Ct. at 1949). "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 129 S. Ct. at 1950). Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and ... determine whether they plausibly give rise to an entitlement of relief." Iqbal, 129 S. Ct. at 1950.

To plausibly state a claim premised on aiding and abetting, New York law requires the plaintiff to "allege (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of the violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong." Agape I, 681 F. Supp. 2d 352, 362 (E.D.N.Y. 2010) (citing Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983)). These claims are also subject to the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Rule 9(b) applies equally to claims alleging aiding and abetting fraud, Armstrong, 699 F.2d at 92–93, aiding and abetting breach of fiduciary duty sounding in fraud, Kolbeck v. LIT America, Inc., 939 F. Supp. 240, 245 (S.D.N.Y. 1996), and aiding and abetting conversion premised on fraud, Daly v. Castro Llanes, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998). Accordingly, "[a] plaintiff alleging aiding and abetting claims sounding in fraud must also plead the elements of aiding and abetting with particularity." Berman v. Morgan Keegan & Co., No. 10-CV-5866, 2011 U.S. Dist. LEXIS

27867, at * 21 (S.D.N.Y. Mar 14, 2011) (citing <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 292-93 (2d Cir. 2006)).

BOA asserts that the Plaintiffs "have simply re-written their entire Original Complaint using more sensational language to describe the same factual allegations" and "have alleged almost <u>no</u> new facts" to support their aiding and abetting claims. (Def.'s Br. at 2.) Accordingly, BOA moves to dismiss the Second Amended Complaints under Rule 12(b) on the grounds that the Second Amended Complaints fail to state a claim and do not meet the heightened pleading standard required by Rule 9(b) for aiding and abetting claims premised on fraudulent activity.

**B. As to Aiding and Abetting Fraud**

The first cause of action that the Plaintiffs assert in the Second Amended Complaints is that BOA aided and abetted the fraud committed by Cosmo and Agape. "To establish liability for aiding and abetting fraud, a plaintiff must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." <u>Rosner v. Bank of China</u> ("<u>Rosner I</u>"), No. 06-CV-13562, 2008 WL 5416380, at *4 (S.D.N.Y. Dec. 18, 2008), <u>aff'd</u> 349 Fed. App'x 637 (2d Cir. 2009) ("<u>Rosner II</u>") (internal quotation marks and citation omitted); <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 292 (2d Cir. 2006). Here, BOA contends that the Plaintiffs have failed to plausibly plead the latter two elements.

**1. Actual Knowledge**

Rule 9(b) permits "[m]alice, intent, [and] knowledge" to be averred generally. Fed.R.Civ.P. 9(b). However, because courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations [,] ... plaintiffs must allege facts that give rise to a strong

inference of fraudulent intent." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995) (internal quotation marks and citation omitted). A strong inference of fraud "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994).

The actual knowledge element of a claim for aiding and abetting is a distinct requirement from the scienter required to allege the underlying fraud. Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010). While a plaintiff may adequately plead under Rule 9(b) the scienter required to support an underlying fraud claim "by providing a factual basis which gives rise to a strong inference of fraud, including facts that constitute strong circumstantial evidence of . . . recklessness, [case law] defines knowledge in the context of an aiding and abetting claim as actual knowledge." J.P. Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 253 n.4 (S.D.N.Y. 2005) (internal quotation marks and citation omitted); see also Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006).

Specifically, the Plaintiffs "must allege that the defendant had actual knowledge of the wrongful conduct committed, not simply that the defendant should have known of the conduct." Anwar, 728 F. Supp. 2d at 442–43 (citing Rosner II, 349 Fed. App'x 637, 639 (2d Cir. 2009). Statements alleging that that a defendant "should have known that something was amiss with [] transactions," even if pled with conclusory statements that the defendant "actually knew something notwithstanding . . . [are] insufficient to support an aiding-and-abetting claim under New York law." Rosner II, 349 Fed. App'x at 639. Thus, "as in the context of pleading a primary violation, pleading knowledge for purposes of an aiding and abetting claim requires

allegations of facts that give rise to a 'strong inference' of actual knowledge." Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt, LLC, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007).

Ordinarily, "evidence of recklessness, conscious avoidance, or willful blindness as to whether the primary actor is engaged in fraud is not sufficient to satisfy the knowledge element of [and aiding and abetting fraud] claim." In re Allou Distributors Inc., Adv. No. 03-08482, 2011 Bankr. LEXIS 838, at *40 (Bankr. E.D.N.Y. Mar. 18, 2011). However, under certain circumstances, some courts have found that a plaintiff met the actual knowledge requirement for aiding and abetting fraud or a breach of fiduciary duty through allegations of conscious avoidance. Whereas constructive knowledge is "[k]nowledge that one using reasonable care or diligence should have" and "imputes a state of mind on a theory of negligence", conscious avoidance "occurs when it can almost be said that a defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." Fraternity Fund, 479 F. Supp. 2d at 368 (internal quotation marks and citation omitted). Thus, a theory of actual knowledge based on conscious avoidance requires facts supporting an inference that the defendant acted with a culpable state of mind.

BOA argues that the Court should not consider whether allegations of conscious avoidance satisfy the actual knowledge requirement because the cases that have permitted plaintiffs to plead this theory "are in the minority." (Def.'s Br. at 11.) While this may have been the case prior to the ruling in Fraternity Fund, many courts adjudicating whether a plaintiff has pled actual knowledge on an aiding and abetting claim since that decision have at least considered whether, and in some cases found, that allegations of conscious avoidance constitute actual knowledge. See, e.g., In re Refco Secs. Litig., --- F.Supp.2d ----, 2010 WL 5129073, *25 (S.D.N.Y. 2010) ("If conscious avoidance is enough to satisfy a criminal charge of aiding and

abetting, it should certainly suffice for a civil claim."); Anwar, 728 F. Supp. 2d at 443 ("[T]he Court finds that Plaintiffs allege a strong inference that the Citco Defendants 'consciously avoid[ed] confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor [they] substantially further[ed].'") (quoting Fraternity Fund, 479 F. Supp. 2d at 368) (alterations in original); Kirschner v. Bennett, 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009) ("To survive a motion to dismiss, therefore, the [plaintiff] must allege facts giving rise to a 'strong inference' of defendant's actual knowledge of the underlying harm, or the conscious avoidance of the same such that 'it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge.'") (quoting Fraternity Fund, 479 F. Supp. 2d at 367–68).

Ultimately, the Court agrees with the rationale in Fraternity Fund that there is "no reason to spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers." 479 F. Supp. 2d at 368. However, the Court notes that this standard does not impose a duty on a bank to take actions they otherwise would not have taken based on a suspicion of fraud. Rather, conscious avoidance requires looking at whether a plaintiff has plausibly alleged that a defendant made certain decisions specifically to avoid attributable knowledge of the underlying fraudulent scheme.

Here, the Plaintiffs contend that they have adequately pled a strong inference of fraudulent intent based on BOA's actual knowledge of the Cosmo/Agape Ponzi scheme from: (1) direct and/or circumstantial evidence from BOA's active review of the Agape account activity and BOA's close relationship with Cosmo and Agape and (2) BOA's actions that

constitute conscious avoidance. The Plaintiffs further assert that they have adequately pled a strong inference of fraudulent intent based on BOA's motive and opportunity to assist the fraud.

### a. Whether Allegations of Direct and/or Circumstantial Evidence Raise an Inference that Bank of America had Actual Knowledge of the Agape Fraud

### i. Bank of America's Active Review of Agape's Account Activity

According to the Plaintiffs, BOA acquired actual knowledge of the Ponzi scheme based on the frequent and in-depth review of the Agape account activity. In particular, the Plaintiffs allege that: (1) BOA employee Tom Sullivan reviewed the Agape account activity and discussed it with Cosmo at frequent lunches; (2) through the Connection computer program, Sullivan received notifications every morning of major deposits and wire transfers from the Agape account in his capacity as the Agape account representative; (3) beginning in June 2006, BOA began charging Agape "account analysis fees" in exchange for BOA "actively monitor[ing] and analyz[ing] Agape's network of accounts" (SAC ¶ 39; Clarke SAC ¶ 139); and (4) BOA employee Rebecca Campagnuolo frequently reviewed the Agape account information and provided banking services directly to Agape while serving as the on-site BOA representative at the Agape offices. The Plaintiffs then allege that, based on what Sullivan, Campagnuolo, and the BOA employees monitoring the Agape accounts witnessed, BOA acquired actual knowledge of the fraud.

In particular, the Plaintiffs allege that by monitoring the Agape accounts BOA saw certain indicators of fraudulent activity, namely: commingling of investor funds; no separate account for payroll and operating costs; money going in and out of accounts being equal; an empty escrow account; and multiple large transfers of over $10,000 each month that required bank approval. As BOA correctly points out, this Court has already held that these allegations, which are identical to those in the Initial Complaints, are considered "red flags" or badges of

fraud in account activity, which "merely show that BOA had <u>constructive knowledge</u> of Cosmo's scheme." <u>Agape I</u>, 681 F. Supp. 2d at 364 (emphasis in original).

In an effort to highlight the obviousness of the fraud based on the account activity, the Class Action Plaintiffs provide a chart showing the monthly deposits, withdrawals, and end balance for the main Agape account from January 2006 through January 2009. However, while a visual representation of the account activity and actual dollar amounts in hindsight may suggest that the fraud was obvious, it does not change the fact that the Court can only infer that this information raises an inference of BOA's constructive knowledge of the fraud. Furthermore, the fact that the Plaintiffs have now alleged that BOA employees actually saw this account activity, without more, does not cross the line from constructive to actual knowledge. Where, as here, the defendant owes no independent duty to the Plaintiffs, "even alleged ignorance of obvious warning signs of fraud will not suffice to adequately allege actual knowledge." <u>Chemtex, LLC v. St. Anthony Enterprises, Inc.</u>, 490 F. Supp. 2d 536, 547 (S.D.N.Y. 2007); <u>Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.</u>, No. 98 Civ. 4690, 1999 WL 558141, at *1–2, 7–8 (S.D.N.Y. July 30, 2009) (holding that actual knowledge was insufficiently alleged against a bank that allowed a fraudulent company to open multiple accounts through which multi-million dollar transfers, many of which were flagged as fraudulent, were made into the personal account of the supposed business owner); <u>Mazzaro de Abreu v. Bank of America Corp.</u>, 525 F. Supp. 2d 381, 390 (S.D.N.Y. 2007) (finding that while patterns of bank transfers and withdrawals and low account balances were indicative of fraud, such behavior "at most would indicate only constructive knowledge of a fraudulent scheme, and are insufficient to support an allegation that [a bank] had actual knowledge of an underlying fraud"); <u>Nathel v. Siegal</u>, No. 07-CV-10956, 2008 WL 4684171, at *12 (S.D.N.Y. Oct. 20, 2008) ("Even where a bank was on notice of 'red

flags' that indicated certain accounts may have been vehicles for fraudulent activity and referred the case to its internal fraud unit, the bank had only suspicions but not actual knowledge of fraud.").

The Plaintiffs further argue that the Court can infer BOA's actual knowledge from the account activity because this activity was inconsistent with Cosmo's representations about operating a bridge loan business. Indeed, the Plaintiffs allege that this pattern of almost identical deposits and withdrawals each month gave BOA actual knowledge of the fraud because "[n]o legitimate business takes in hundreds of millions of dollars per month only to disburse an equal amount the same month, while retaining relatively tiny balances for operating expenses." (SAC ¶ 45; Clarke SAC ¶ 145.) However, a conclusory allegation that "no legitimate business" would have the pattern of account activity present in the Agape accounts, and the assertion that the account activity was obviously inconsistent with what BOA knew about Agape's business "at most indicate only constructive knowledge of a fraudulent scheme, and are insufficient to support a strong inference that [BOA] had actual knowledge of the underlying fraud." Rosner I, No. 06-CV-13562, 2008 WL 5416380, at *6 (S.D.N.Y. Dec. 18, 2008) (holding that factual allegations including that the defendant bank knew from viewing the fraudulent company's accounts that "the repetitive cash withdrawal of all the funds in the disbursing account was plainly inconsistent with the nature of the account holder's business as a 'currency trader'" did not support the plaintiff's argument the "atypical and non-routine nature" of deposits made it "simply implausible that [the defendant bank] did not have actual knowledge of the underlying scheme").

However, even assuming that the Court could infer BOA's actual knowledge of the scheme based on the fact that the account activity was inconsistent with Agape's purported

business, the Plaintiffs have not stated with any particularity that any BOA employees knew that Agape was limited to providing bridge loans. As the Plaintiffs admit, BOA never conducted an investigation into Agape or performed an audit of Agape. Instead, the Plaintiffs contend that due diligence conducted in conjunction with the opening of Cosmo's accounts; BOA's extension of personal and commercial lines of credit to Agape and Cosmo; and BOA's issuance of the RDS, either provided BOA with actual knowledge of the Ponzi scheme, or enough information about Agape that, combined with the account activity, would raise a strong inference of actual knowledge. For its part, BOA contends that there is a difference between what the Plaintiffs allege BOA actually reviewed and learned, and what BOA could have reviewed and learned. The Court agrees.

With respect to the due diligence reviews, the Plaintiffs fail to identify any books, records, or other information outside of the Agape account activity that would have provided BOA with actual knowledge of Agape's either stated or actual business scheme. The Plaintiffs cannot plausibly allege actual knowledge through conclusory statements that BOA's due diligence review "revealed a lack of any legitimate business enterprise and the illegality of the scheme" (SAC ¶ 38; Clarke SAC ¶ 138) or otherwise gave BOA "actual knowledge" of the Ponzi scheme. See Mazzaro de Abreu, 525 F. Supp. 2d at 390 ("Plaintiffs also allege that [the BOA employees] 'knew they were helping Ferreira steal Plaintiff's money.' Plaintiffs do not flesh out this allegation with any other information; thus, the claim is conclusory, and as such, it is insufficient to indicate BOA's knowledge of Bank of Europe's fraudulent activities."). If the Court does not consider all of the speculative and conclusory allegations, the only information other than the "red flags" in the account activity that the Plaintiffs allege that BOA actually

learned in the three due diligence reviews was that Cosmo was a convicted felon and that Agape was a "financial firm."

Because Cosmo's previous conviction did not involve the Plaintiffs or Agape, BOA's knowledge of Cosmo's previous fraud conviction "do[es] not constitute actual knowledge of a fraud perpetrated years later merely because [Cosmo] was involved." Renner v. Chase Manhattan Bank, No. 98-CV-926, 2000 WL 781081, at *8 (S.D.N.Y. June 16, 2000), aff'd 85 Fed. App'x 782 (2d Cir. 2004). As the court noted in Renner, at most, knowledge of a previous fraud entitles a plaintiff "to the inference" that a defendant "should have known there was a possibility of fraud." Id. Additionally, knowledge that Agape is a financial firm is not equivalent to knowledge of Agape's agreements with investors and the scope of Agape's investment authority.

Notably, the allegations in this case fall far short of those in Benson v. J.P. Morgan Chase Bank, N.A., Nos. 09-CV-5272, 09-CV-5560, 2010 WL 1526394 (N.D. Cal. Apr. 15, 2010), which Plaintiffs attempt to rely on for the proposition that "red flags" in account activity combined with knowledge of the purported business can support an inference of actual knowledge. The alleged Ponzi scheme in Benson involved Nevada LLCs set up by William Wise, Jacqueline Hoegel and Kristi Hoegel ("Wise, et al."), that purported to sell certificates of deposit ("CDs") to investors. Wise, et al. set up accounts for the Nevada LLCs at Washington Mutual, Inc., the predecessor bank of the defendant JPMorgan Chase Bank, N.A. ("WaMu/JPMorgan"), and transacted exclusively through a local branch in the city of Napa. As in the present case, WaMu/JPMorgan installed remote banking systems for the Nevada LLCs to allow Wise, et al. to perform wire transfers and check deposits from their offices. Also, similar to the instant case, WaMu/JPMorgan closely monitored the Nevada LLC accounts and knew that

the investor funds were being commingled and not being used for their stated purpose, which in Benson was the purchase of CDs.

However, unlike in the present case, the plaintiffs in Benson provided significantly more facts supporting an inference that WaMu/JPMorgan had actual knowledge that the only proper use of the funds was for the purchase of CDs.  For example, WaMu/JPMorgan performed two audits of the Nevada LLCs in conjunction with installing the remote deposit systems.  The plaintiffs in Benson alleged that these audits revealed, among other things, the nature of the business conducted by the Nevada LLCs; that neither Wise, et al. nor the Nevada LLCs were registered to sell securities; that investor funds were not being used to purchase CDs; and that funds were being wired to offshore bank accounts or to pay Wise, et al.'s personal expenses.  Id. at *1, 3.  In addition, the plaintiffs in Benson alleged that WaMu/JPMorgan had actual knowledge of the investor's expectations for how the money would be used based on the face of the investor's checks, which specifically indicated that the checks were intended for the purchase of CDs.  Id. at *3.  Given these allegations, the Benson court found that the plaintiffs had alleged facts raising a strong inference that WaMu/JPMorgan had actual knowledge of the Ponzi scheme. Id.

By contrast, the Plaintiffs here have failed to allege that BOA gained knowledge from the due diligence reviews that Agape was limited to funding bridge loans or any other limitations on its investment authority.  Absent any non-conclusory or speculative allegations with respect to what non-account related documents BOA reviewed or information they obtained other than the "red flags" in the account activity, the Plaintiffs cannot rely on their speculation that these actions led to BOA's actual knowledge of the fraud.  See MLSMK Investments Co. v. JP Morgan Chase & Co., 737 F. Supp. 2d 137, 144 (S.D.N.Y. 2010) ("While it may be true that

Defendants could have connected the dots to determine that Madoff was committing fraud, Plaintiff offers no facts to support the claim that they actually reached such a conclusion.").

Here, at most the Plaintiffs allege that BOA was aware that Agape was not dealing in a forthright manner with investors and acting improperly by failing to fund sizable or material construction projects. Under Second Circuit case law, BOA's knowledge that Agape was acting improperly in one capacity does not raise a strong inference that BOA had actual knowledge of the underlying fraudulent scheme. See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 293 (2d Cir 2006) ("The plaintiffs allege in detail that the banks knew that Schick engaged in improper conduct that would warrant discipline by the Appellate Division, but those alleged facts do not give rise to the 'strong inference,' required by Federal Rule of Civil Procedure 9(b), of actual knowledge of his outright looting of client funds.").

### ii. Bank of America's Close Relationship with Cosmo and Agape

The Plaintiffs further assert that BOA had actual knowledge of the Ponzi scheme based on the close business relationship between BOA and Agape as evident by: (1) the formal monitoring of the Agape account; (2) Cosmo's relationship with Agape's account representative Tom Sullivan, who recommended the Agape account structure and the issuance of the RDS, and who received daily updates of the large withdrawals or deposits in Agape's account; and (3) BOA employee Rebecca Campagnuolo working in Agape's headquarters. In support of their argument that this close relationship supports an inference that BOA had actual knowledge of the fraud, the Plaintiffs again rely on Benson.

In Benson, the court found the following similar facts with respect to the relationship between WaMu/JPMorgan senior employees and the perpetrators of the Ponzi scheme, Wise, et al., to be persuasive on the issue of actual knowledge: (1) that the Ponzi scheme was effectuated

at a small Napa branch of WaMu/JPMorgan and was among the largest accounts handled at that branch; (2) two senior employees monitored and assisted in various banking transactions by Wise, et al. over a four year period, including supervising and effectuating daily deposits, withdrawals, and wire transfers of large sums of money on behalf of Wise, et al.; and (3) the senior employees recommended the installation of an RDS because of the significant amount of time required to service the accounts. 2010 WL 1526394, at *4. The court held that the fact that these transactions occurred and were overseen by senior bank officials at a small Napa branch "makes it reasonable to infer that senior employees at the Napa branches personally knew about the nature of the accounts and transactions and were thus aware of [the] Ponzi scheme." Id. However, while these allegations may be sufficient to plausibly allege actual knowledge in the Ninth Circuit, absent more specific allegations, courts in this circuit have been less willing to infer actual knowledge based on a close relationship between a bank employee and the perpetrator of the scheme.

For example, in a series of three decisions in Renner v. Chase Manhattan Bank, 1999 WL 47239 (S.D.N.Y. 1999) ("Renner I"); 2000 WL 781081 (S.D.N.Y. 2000) ("Renner II"); and 85 Fed. App'x. 782 (2d Cir. 2004) ("Renner III"), the lower court found, and the Second Circuit upheld, that a more significant relationship between a bank employee and the perpetrators of the fraud, where the bank employee was alleged to have had considerably more information about the nature of the transactions, did not raise a strong inference of actual knowledge.

The basic scheme in Renner involved the plaintiff investing $3 million into an entity called Hampstead Trust Ltd. ("Hampstead") that purported to transact in "medium term bank debentures" through an entity called Townsend, its securities house in the United States. However, rather than invest the money, the perpetrators of the fraud wired the funds to an

offshore personal account in Monaco. The Townsend accounts that were used to perpetrate the fraud were located in the Mount Vernon branch of Chase Manhattan Bank ("Chase"). Based on, among other acts, the pre-existing relationship between the Mount Vernon branch manager Michelino Morelli ("Morelli") and the perpetrators of the scheme, and Morelli's alleged knowledge of the scheme, the plaintiff brought claims against Morelli and Chase for aiding and abetting the fraud. Specifically, the plaintiff alleged that Morelli had actual knowledge of the fraud based on: (1) his pre-existing close personal relationship with the perpetrators of the fraud; (2) his assistance in setting up an initial bank account for Hampstead that was closed by Chase and a subsequent bank account for Townsend that was ultimately used to facilitate the fraud; (3) discussions with Townsend about how the plaintiff's money was supposed to be used and how the account holding the plaintiff's money should be structured; (4) his silent participation in phone conversations between Chase employees and Townsend where the Chase employees expressed concern about the proposed transactions involving the plaintiff's money; and (5) his approval of the wiring of the plaintiff's money to one of the perpetrators' personal accounts in Monaco.

In Renner I, the court dismissed the complaint against Morelli and Chase for aiding and abetting fraud, holding that:

> At the very most, these allegations raise the possibility of constructive knowledge on Morelli's part, namely, that Townsend might not be dealing with Renner in a wholly forthright manner, consistent with Renner's instructions and expectations. But the allegations fall well short of imparting to Morelli actual knowledge that, as soon as the Renner funds were received, they would be diverted to conspirators in Monaco, as the complaint alleges did occur.

Renner I, 1999 WL 47239, at *12.  Subsequently, the plaintiff filed an amended complaint,

providing additional factual details about the conversation between Morelli and Townsend prior

to depositing the plaintiff's money, stating that:

> Morelli had a conversation with Townsend during which they
> discussed that Renner was a client of Hampstead, that Hampstead
> intended to use the Plaintiff's funds to purchase a performance
> bond for another Hampstead customer, that Renner wanted
> confirmation by Chase of the receipt of his money in the
> Townsend Fund account, and the merits of using a custodial versus
> a commercial account.

Renner II, 2000 WL 781081, at *7.  The plaintiff also added more particularity with regard to the

substance of the conversations that Morelli listened to, but did not actively participate in, where

Chase employees expressed concerns to Townsend about the transactions, and facts relating to

Morelli's knowledge of the earlier Hampstead accounts that were closed due to irregularities.

Taking all of these circumstances into account, the court held that:

> At most, Renner is entitled to the inference that Morelli should
> have known that there was the possibility of fraud. But what
> Morelli should have known is irrelevant. The law is only interested
> in what he actually knew, and Plaintiff has failed to demonstrate
> that the amended complaint adequately alleges that Morelli knew
> about the fraudulent scheme.

Id. at *8.  This decision was affirmed by the Second Circuit, which held that "Plaintiff's

amended complaint failed to sufficiently plead that either Morelli or Chase, as aiders and

abettors, had actual knowledge of the primary wrongdoer's fraud and substantially assisted in the

primary wrongdoing."  Renner III, 85 Fed. Appx. at 784.

Another example comes from the recent decision in Berman v. Morgan Keegan & Co.

Inc., No. 10-CV-5866, 2011 U.S. Dist. LEXIS 27867 (S.D.N.Y. Mar. 14, 2011), which involved

allegations relating to the knowledge of a bank employee responsible for overseeing trading

accounts and effectuating trades on behalf of an alleged Ponzi scheme.  In Berman, the plaintiffs

alleged that Morgan Keegan & Co. ("Morgan Keegan"), a securities broker-dealer, aided and

abetted the fraud, breach of fiduciary duties and conversion by the perpetrators of an alleged

Ponzi scheme ("Derivium" "Bancroft" or "Derivium/Bancroft").  A senior vice president at

Morgan Keenan named Robert Gooch ("Gooch"), who, the plaintiffs' alleged, was a personal

friend of two of Derivium's directors and officers, and was the broker-dealer assigned to manage

and monitor the Derivium account.  Id. at *10–11.  The plaintiffs alleged that Gooch frequently

communicated with Derivium and executed the transfer of securities on behalf of

Derivium/Bancroft; observed all of the trading activities; approved or declined certain trades;

imposed restrictions held in the Derivium/Bancroft accounts; and loaned funds to

Derivium/Bancroft.  Id. at *11.  To support the contention that it was plausible that Gooch had

actual knowledge that the transactions he was effectuating and the account activity contradicted

what had been represented to investors, the plaintiffs referenced a print out from Derivium's

website that Gooch allegedly placed in the Bancroft account file at Morgan Keegan.  Id. at *28.

Despite the alleged close personal and business relationship between Gooch and

Derivium/Bancroft, the court held:

> Although plaintiffs allege that Gooch managed and monitored the
> Derivium account maintained at Morgan Keegan, the Complaint
> does not allege that Gooch ever read or reviewed this document or
> took any actions indicating that he understood how the program
> was marketed to borrowers.

Id. at * 29.  Thus, while the California court in Benson may have been willing, without more, to

infer actual knowledge from a close relationship between a bank employee and the perpetrators

of the Ponzi scheme, that holding is not consistent with the law in the Second Circuit.

The Plaintiffs allegations that Sullivan and/or Campagnuolo had actual knowledge of the

terms of the agreement between Agape and investors and the scope of Agape's investment

authority fall far short of the allegations that were rejected in Renner and Berman.  First, the

Plaintiffs allege that both Sullivan and Campagnuolo, through their interactions with Cosmo and

Agape, became aware that Agape told investors that its business model exclusively involved providing bridge loans for construction projects. Therefore, the Plaintiffs claim that based on Sullivan and Campagnuolo's active review of the accounts, which revealed that no such loans were being made, BOA acquired actual knowledge of the fraud. However, the Plaintiffs fail to provide a basis for asserting that Sullivan or Campagnuolo were aware of this limitation on Agape's investment authority.

For example, the Plaintiffs allege that at a meeting between Cosmo and Sullivan, "[t]hey discussed the business of Agape and Sullivan made clear he understood." (SAC ¶ 47; Clarke SAC ¶ 147.) As an initial matter, it is unclear on what basis the Plaintiffs, who were not present for these conversations between Cosmo and Sullivan, are aware of the substance of these conversations. Although the Plaintiffs do not state that the allegations are made "'upon information and belief', it is difficult to see how it could be otherwise." Renner I, 1999 WL 47239 at *12. "Allegations of fraud cannot ordinarily be based upon information and belief, except as to matters peculiarly within the opposing party's knowledge." Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 664 (2d Cir. 1997). In their opposition to the instant motion, the Plaintiffs claim that this information is based on "first-hand accounts." (Pls.' Br. at 17.) However, as BOA correctly notes, the Plaintiffs do not make this assertion in the Second Amended Complaints. It is well-settled that a plaintiff cannot amend the complaint through briefs and affidavits, and "such facts are thus irrelevant for purposes of determining whether [the Plaintiff's] [c]omplaint should be dismissed for failure to state a claim." Pollio v. MF Global, Ltd., 608 F. Supp. 2d 564, 568 n.1 (S.D.N.Y. 2009); see also McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007) (stating that on a motion to dismiss the court's review is

"limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference").

However, even accepting the Plaintiffs' version of the Cosmo/Sullivan conversation, it would require too great a logical leap to presume that this vague allegation supports an inference that Cosmo explained, and Sullivan understood, the exact nature of Agape's agreement with investors, including the scope of Agape's investment authority. With respect to Campagnuolo, the Plaintiffs provide no facts supporting the scope of her knowledge of Agape's business and investment restrictions, other than presumably relying on the allegations with respect to her interaction with Agape employees. As noted above, while such a presumption may have been sufficient in Benson, the mere fact that a bank employee frequently interacted with the perpetrators of the fraud while performing conventional banking services does not plausibly allege actual knowledge in the Second Circuit.

Furthermore, the Plaintiffs allege that, based on their review of the account activity, Sullivan knew that Agape was not "funding any sizable construction projects" (SAC ¶ 64; Clarke SAC ¶ 164) (emphasis added), and Campagnuolo "knew no material construction loans were being made." (SAC ¶ 55; Clarke SAC ¶ 155) (emphasis added). The Court notes that as the Plaintiffs themselves state, at some point, Agape expanded its business model to include making bridge loans to merchants carrying credit card accounts payable from month to month. However, the Plaintiffs make no allegations with respect to whether Sullivan or Campagnuolo were aware that Agape was authorized to make these non-construction bridge loans, or whether they were aware that Agape was not making any material non-construction bridge loans. Taken together, these allegations are insufficient to infer BOA's actual knowledge of the fraud based on the account activity because they fail to adequately allege that through Sullivan or Campagnuolo,

BOA had actual knowledge of the scope of Agape's investment authority. At most, the Plaintiffs' have plausibly alleged that Sullivan and Campagnuolo knew that Agape was not funding significant construction projects and therefore "might not be dealing with [the Plaintiffs] in a wholly forthright manner, consistent with [the Plaintiffs'] . . . expectations." Renner I, 1999 WL 47239, at *12. However, "the allegations fall well short of imparting to [BOA] actual knowledge" that, Cosmo and Agape were operating a Ponzi scheme. Id.

The Plaintiffs remaining allegations with respect to Sullivan's interactions with Cosmo similarly fail to raise an inference of actual knowledge. According to the Plaintiffs, Sullivan had frequent lunch meetings with Cosmo where they discussed his business and the accounts, and Sullivan recommended the Agape account structure and issuance of an RDS that assisted Cosmo in facilitating the fraud. However, the Plaintiffs fail to provide any facts suggesting that having a dedicated account manager for a large customer, who makes recommendations about how to set up accounts or to use bank services available to all commercial clients, are atypical banking procedures. Cf. Mazzaro de Abreu, 525 F. Supp. 2d at 390 (finding actual knowledge where the plaintiffs alleged that a BOA employee suggested to the perpetrator of the fraud "that it 'more effectively could conceal the fraud by opening a separate bank account.'"). Here, the Plaintiffs do not allege that Sullivan had any involvement with Agape beyond his role in providing banking services, and it is well-settled that a banking relationship alone is insufficient to show that the funds held at the bank were obtained through fraudulent means. Rosner II, 349 Fed. App'x. 637, 639 (2d Cir. 2009) (finding a lack of factual allegations that point to actual knowledge of the fraudulent source of the deposited money since the bank's relationship with the perpetrators of the underlying fraud did not extend beyond a banking relationship).

Finally, the Plaintiffs allege that the Court can infer that BOA had actual knowledge of the fraud based on Campagnuolo's presence at the Agape office. The Court initially notes that the Plaintiffs have dramatically drawn back their allegations with respect to what was previously referred to as the "Agape Branch." Although described in the Initial Complaints as a de facto BOA office where multiple employees were stationed to assist Agape, the Plaintiffs now allege that the "Agape Branch" was more akin to one employee, now identified as Campagnuolo, who at an unspecified time began providing conventional banking services to Agape out of an office at their headquarters.

Many of the allegations that the Plaintiffs rely upon to support an inference of actual knowledge based on Campagnuolo's presence at the Agape headquarters have already been rejected by this Court. In particular, in the Second Amended Complaints, the Plaintiffs simply identify Campagnuolo as the previously unnamed BOA employee working at the Agape headquarters who helped Agape solicit investors; she issued a check to an investor at Cosmo's direction; and she failed to correct a broker's misapprehension about the size of a loan BOA was providing to Agape. In <u>Agape I</u>, the Court found that all of the above allegations that the Plaintiffs contend indicate that the BOA employee located at the Agape office was either in on the fraud or oblivious to certain "red flags" were insufficient to support an inference of actual knowledge. 681 F. Supp. 2d at 362. The fact that Campagnuolo was unidentified in the original complaint was not the basis for this ruling. Rather, this Court held that "[a]lthough these interactions <u>may</u> have given a prudent bank employee cause for concern, the Court does not believe that either of these allegations give rise to the strong inference that the BOA employee was complicit in Cosmo's scheme. . . .[or] that the unnamed BOA employee was even cognizant of Cosmo's scheme." <u>Id.</u> (emphasis in original).

Furthermore, to the extent the Plaintiffs add new allegations with respect to Campagnuolo, they similarly fail to raise an inference of actual knowledge. First, the Plaintiffs allege that in late 2008, Campagnuolo became the de facto Controller of Agape. However, in this allegation, pled upon information and belief, the Plaintiffs do not allege that Campagnuolo took on any responsibilities or acquired any additional information that could support an inference of actual knowledge of the fraud. Rather, the Plaintiffs allege that in this role, Campagnuolo "had a close-up view of the striking ramping up of investor withdrawals[;] [2] knew that Cosmo held meetings for investors twice daily to calm and reassure investors, and to desperately solicit more investor money to keep Agape afloat [; and] [3] watched as dozens of anxious investors demanded the return of their money in a "'run on the bank.'" (SAC ¶ 56; Clarke SAC ¶ 156.) While these actions may have provided Campagnuolo actual knowledge of a company failing during an economic crisis, it does raise an inference that she had actual knowledge of a failing Ponzi scheme.

Considering the totality of the Plaintiffs allegations, the Court cannot conclude that they have plausibly alleged that BOA had actual knowledge of the Ponzi scheme. The Plaintiffs reliance on the recent First Department decision in Oster v. Kirschner, 77 A.D.3d 51, 905 N.Y.S.2d 69 (1st Dep't 2010) does not lead to different conclusion. In Oster, the court noted that actual knowledge of fraud can be "discerned from the surrounding circumstances." 77 A.D.3d at 56, 906 N.Y.S.2d at 72. However, the "surrounding circumstances" in Oster involved the defendants' actual knowledge that a private placement memoranda that they prepared, which were "the admitted vehicle by which investment in the Ponzi scheme was carried out", contained material misrepresentations. Id., 77 A.D.3d at 55–56, 905 N.Y.S.2d at 72. Notably, under the same set of facts in a federal action brought by a different set of plaintiffs, the court in Hightower

32

v. Cohen, No. 08-CV-3229, Docket No. 91 (E.D.N.Y. Sept. 30, 2009) (Dearie, J.), granted the motion to dismiss the claim for aiding and abetting fraud. The court noted that the defendants' knowledge of the misrepresentations in the private placement memoranda may have given the defendants actual knowledge of the "dissemination of the misleading offering documents [that] formed part of the . . . scheme". Id. at 9–10. However, Judge Dearie observed that this knowledge was only "one step of a 'complex scheme to defraud'" and therefore could not be said to have given the defendants actual knowledge of the Ponzi scheme, which was the operative fraud that caused the plaintiffs' harm. Id. at 10.

While the Plaintiffs have gathered allegations of "red flags" and suspicious circumstances, which in hindsight may appear to indicate the obviousness of the fraud, these allegations fail to rise to level of specificity that New York state courts and courts in the Second Circuit have routinely required before holding that a plaintiff has sufficiently alleged facts that raise a strong inference of actual knowledge from circumstantial evidence. See, e.g., Wight v. BankAmerica Corp., 219 F.3d 79, 82–83, 92 (2d Cir. 2000) (finding actual knowledge where bank employees had personal ties to the parties committing the fraud and knew that money was being transferred to shell corporations); Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 442–43 (S.D.N.Y. 2010) (finding allegations of actual knowledge to be sufficient where defendants allegedly knew of specific deficiencies in accounting and due diligence standards of an investment fund and knew that the investment fund falsely represented these standards to investors); Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt LLC, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007) (finding a strong inference that an auditor had actual knowledge of fraud where the information to be audited was accompanied by a note that implied that the information would not be corroborated by the audit and the auditor complied with the note's instructions in not

confirming the data); Allied Irish Banks, P.L.C., v. Bank of America, N.A., No. 03-CV-3748, 2006 WL 278138, at *11 (S.D.N.Y. Feb. 2, 2006) (holding that actual knowledge of fraud was adequately pled where plaintiff alleged that the perpetrator of the fraud repeatedly told the defendant banks "that he was requesting that information be omitted from daily trade confirmations, monthly reports, and communications between [the defendant banks and one of the plaintiff's subsidiaries] because he sought to conceal such information from his employer"); J.P. Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 253–54 (S.D.N.Y. 2005) (finding allegations that described the massive scope of the fraudulent scheme and intricate details about its operation to serve as a basis for showing the underlying fraud, while finding allegations that defendants sent and received emails that referenced the core of the fraudulent scheme, served as a basis for showing actual knowledge); Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158, 167 (S.D.N.Y. 2003) (finding an strong inference of actual knowledge where Citibank employees altered checks, provided reference letters after closing the account on suspicion of fraud, and after closing the accounts assisted in moving stolen money out of the accounts); Prudential-Bache Securities, Inc. v. Citibank, N.A., 73 N.Y.2d 263,276, 536 N.E.2d 1118, 1125–26, 539 N.Y.S.2d 699, 706–07 (1989) (finding actual knowledge where bank employees themselves allegedly participated in the fraudulent money laundering scheme by preparing improper accounting records with knowledge of the immediate managers).

### b. Whether the Allegations Raise an Inference that Bank of America Consciously Avoided Acquiring Actual Knowledge of the Agape Fraud

The Plaintiffs also attempt to rely on allegations of conscious avoidance to support an inference of knowledge. As previously stated, conscious avoidance "occurs when it can almost be said that a defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge."

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt, LLC, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) (internal quotation marks and citation omitted). Plausibly alleging actual knowledge through conscious avoidance is a very high bar and one that the Plaintiffs were not able to meet.

First, the Plaintiffs contend that BOA's decision to disband its High-Risk Compliance Group in early 2006, which was the division tasked with enforcing the industry Know-Your-Customer and anti-money laundering rules against perceived "high-risk" customers, permitted BOA to consciously avoid confirming the ultimate facts about the Agape Ponzi scheme. However, this allegation is insufficient in that the Plaintiffs fail to allege that this group was disbanded to avoid knowledge of the Agape fraud specifically, as opposed to account fraud generally. In addition, such an inference is belied by the Plaintiffs' own pleadings, where they state that BOA shut down the High-Risk Compliance Group, not to avoid learning of the Agape fraud, but because "its compliance efforts were impeding profits." (SAC ¶ 86; Clarke SAC ¶ 186.) This may have been an unwise business decision, but it does not raise an inference that BOA was acting with a culpable state of mind.

Next, the Plaintiffs allege that BOA's decision not to conduct an on-site audit when they had the opportunity to do so upon issuing the RDS and learning of multiple risk factors "allowed it to avoid confirming its suspicions so that it could later deny knowledge of fraud." (SAC ¶ 89; Clarke SAC ¶ 189.) However, while this decision may have allowed BOA to avoid learning of the fraud, to constitute conscious avoidance, the Plaintiffs must allege facts supporting the inference that BOA decided not to conduct the on-site audit specifically to avoid learning of the fraud. The Plaintiffs do not allege, for example, that in the presence of certain risk factors, BOA policy was always to conduct an on-site audit. There are many actions that BOA could have voluntarily taken to investigate a potential fraud, but the law does not impose such a duty on

banks.  See In re Sharp Int'l Corp., 302 B.R. 760, 775 n.7 (E.D.N.Y. 2003) ([T]he law imposes no affirmative duty on a bank to act when it learns that its borrower is committing a fraud since one does not wish to discourage lenders from conducting investigations of their borrowers. On the other hand, as a matter of public policy such a duty might be desirable to prevent the compounding of losses at least in those situations where the lender knows that by its consent to the refinancing, a looting scheme will be furthered. . . . However, despite these considerations, the law is clear that a lender is not a fiduciary of a borrower, and has no duty to act simply because it suspects or even knows of a fraud perpetuated by the borrower's management.). Accordingly, BOA's decision not to conduct an audit, as with BOA's decisions not to voluntarily investigate the fraud at any other point, even when faced with "red flags" in the account activity, does not constitute conscious avoidance.

Finally, in this regard, the Plaintiffs allege that in September 2008, an unnamed Agape investor and BOA customer provided BOA's Vice President George Bowes with unspecified information indicating that Agape was engaged in a fraudulent scheme. The Plaintiffs contend that Bowes replied "What do you expect me to do with this information? and said it was beyond the scope of the bank's duties to investigate such a charge, even a highly specific one such as this." (SAC ¶¶ 90–91; Clark SAC ¶¶ 190–91.) The Plaintiffs further allege that the investor then made the same report regarding the Agape fraud to the Office of the Controller of the Currency. Through an unidentified chain of events, BOA was made aware of this allegation, and the Plaintiffs contend the investor received a similar response from BOA stating in substance that "allegations that one of the bank's customers is defrauding another is simply not the bank's problem and therefore it would not conduct an investigation." (SAC ¶ 92; Clarke SAC ¶ 192.)

BOA contends that these allegations are insufficient because they are not alleged with adequate specificity. However, even assuming these allegations satisfied the specificity requirements of Rule 9(b), BOA asserts that Bowes and BOA's responses to the investors concerns belie the existence of a culpable state of mind because both responses indicated that it was bank policy not to investigate and not specifically to avoid learning of the Agape fraud. The Court agrees. While this may be bad policy, the law is clear that "[d]efendants cannot be charged with knowledge of . . . misconduct simply because they have knowledge of accusations." <u>Kolbeck v. LIT America, Inc.</u>, 939 F. Supp. 240, 248 (S.D.N.Y. 1996).

### c. Whether the Allegations Raise Strong Inference of Fraud Based on Bank of America's Motive and Opportunity

Finally, the Plaintiffs contend that their allegations satisfy the requirement of pleading the "requisite 'strong inference' of fraud," by alleging "facts to show that defendant[] had both motive and opportunity to commit fraud." <u>Renner II</u>, No. 98-CV-926, 2000 WL 781081, at *5 (S.D.N.Y. June 16, 2000), <u>aff'd</u> 85 Fed. App'x 782 (2d Cir. 2004). A showing of motive must reveal "concrete benefits that could be realized as a result of the fraud." <u>Id.</u>, at *10. The type of benefits required to create a strong inference of fraud must go beyond the "ordinary interests" in the carrying on of business and must do more than only "prolonging benefits in the positions [that defendants] already hold." <u>Id.</u> at *10, *13.

On this subject, the Plaintiffs first allege that BOA had an incentive to aid and abet Agape's fraud due to the substantial stream of income that BOA received from its business with Agape. One source of the additional income that was received from Agape's business was associated with transaction fees, which amounted to "substantial revenues for the bank" due to the "high velocity" and "high volume" of transactions generated by Agape. (SAC ¶ 79; Clarke SAC ¶ 179) However, such an allegation is not sufficient to establish a basis for showing a

strong inference of fraud because "a plaintiff must allege more than [the defendant's] interest in bank fees and deposits in order to create a reasonable inference of fraudulent intent." Renner II, 2000 WL 781081, at *13.  This is the case even when the bank earns "substantial fees" on facilitating an "unusually large volume" of transfers because such a motive is generalized and could be imputed to any for-profit endeavor.  Mazzaro de Abreu v. Bank of America Corp., 525 F. Supp. 2d 381, 388 (S.D.N.Y. 2007).

The second source of the additional income that was received from Agape's business was over "$70,000 in fees in exchange for the thirty-one times [BOA] analyzed Agape's accounts." (SAC ¶ 80; Clarke SAC ¶ 180.)  However, the complaint contains no factual support that these fees were any type of "extraordinary compensation" beyond those that would be paid by other clients for the same services, which does not go beyond ordinary interest in the carrying on of a banking business.  In re Sharp Int'l Corp., 281 B.R. 506, 516 (Bankr. E.D.N.Y. 2002) (finding that a lack of allegations of any extraordinary compensation being received, such as "richer fees" than those paid by other clients, provided no basis for a "strong financial motive" to aid in fraud).

The third source of the additional income received from Agape's business was based on the "banking relationship" between BOA and Agape, pursuant to which BOA received interest payments from the lines of credit that BOA extended to Agape and Cosmo.  However, the creation of a banking relationship and resulting "ordinary interests" in the carrying on of the business is not sufficient to allege a strong inference of fraud.  Renner II, 2000 WL 781081, at *10, *13.  As a result, the fees paid to BOA by Agape do not provide a basis for showing the motive required to successfully allege a strong inference of fraud.

The Plaintiffs further allege that Sullivan had an incentive to aid and abet the Agape fraud due to the additional income that he received from commissions on the Agape business. Sullivan's commissions were based on the balance maintained in the accounts that he serviced, which allegedly created incentive to aid and abet in the fraud because of the "substantial commission" that he received, "in contrast to the relatively small commission he would have received had Agape actually segregated investor funds into its escrow account." (SAC ¶ 81; Clarke SAC ¶ 181.) However, "[w]hile in some cases the enhancement of a defendant's personal compensation may be sufficient to establish motive [sufficient to create a strong inference of fraud]," courts have based such findings on more than the benefits of increased business or income from the business. Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A., 261 F.R.D. 13, 21 (S.D.N.Y. 2009) (finding an alleged basis for fraudulent motive to not be sufficient where there were no allegations of "unusually large brokerage fees" or "exorbitant amounts of interest"). In addition, a showing of a motive required to successfully allege a strong inference of fraud must be based on some benefit beyond additional "compensation or prestige" from a position already held. Renner II, 2000 WL 781081, at *10. Consequently, because the Second Amended Complaints lack allegations that Sullivan received any benefits beyond the ordinary payments earned from his position, the Plaintiffs fail to successfully allege a strong inference of fraud based on motive.

Finally, on this subject, the Plaintiffs allege that the Court can infer a strong inference of fraudulent intent from the fact that that Campagnuolo's husband, Anthony Campagnuolo, received $32,120.68 from Agape between December 3, 2007 and March 20, 2008. The Court finds that these payments are suspect. However, the lack of specificity with regard to the purpose of these payments as well as when Campagnuolo began working at Agape leads the

Court to conclude that, on their own, these payments cannot plausibly allege that BOA had a motive to participate in the fraud.

### 2. Substantial Assistance

The Court also finds that, even assuming the Plaintiffs had plausibly alleged that BOA had actual knowledge of the underlying fraudulent scheme, they have failed to allege that BOA provided substantial assistance.

Substantial assistance is found where "(1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed; and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." Rosner I, No. 06-CV-13562, 2008 WL 5416380, at *5 (S.D.N.Y. Dec. 18, 2008) (citing Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001), and Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 284 (2d Cir. 1992)). When a defendant has no affirmative duty to act, their failure to act may not serve as the basis for claiming that the defendant provided substantial assistance. Rosner I, 2008 WL 5416380, at *5. However, "even in the absence of a duty to act or disclose information, inaction on the alleged aider and abettor's part can provide a basis for liability where the inaction was designed intentionally to aid the primary fraud." In re Monahan Ford Corp. of Flushing, 340 B.R. 1, 34 (Bankr. E.D.N.Y. 2006) (internal quotation marks omitted). Furthermore, an alleged aider and abettor will be liable only where the plaintiff's injury is a direct result or reasonably foreseeable result of the defendant's conduct. Rosner I, 2008 WL 5416380, at *5.

This Court held in Agape I that: (1) the presence of a BOA employee providing conventional banking services at Agape; (2) BOA's opening of accounts and approving transfers; and (3) BOA's failure to investigate "red flags", do not constitute substantial assistance. Agape

I, 681 F. Supp. 2d 352, 365–66 (E.D.N.Y. 2010).  As with the actual knowledge allegations,

adding factual detail to these previously rejected allegations does not impact the Court's analysis.

See In re Sharp Int'l Corp., 403 F. 3d 43, 53 (2d Cir. 2005) ("All the allegations are in substance

the same: that State Street was in a position to blow the whistle on the Spitzes' fraud, but did not

. . .").

Furthermore, even where, as here, the bank receives an explicit report of the fraud, the

bank is under no obligation to investigate or take any affirmative action.  Rosner I, 2008 WL

5416380, at *5 ("Inaction on the part of the alleged aider and abettor "ordinarily should not be

treated as substantial assistance, except when it was designed intentionally to aid the primary

fraud or it was in conscious and reckless violation of a duty to act."); Musalli Factory For Gold

& Jewellry v. JPMorgan Chase Bank, N.A., 261 F.R.D. 13, 25 (S.D.N.Y. 2009) ("Furthermore,

to the extent that Musalli bases its aiding and abetting claim on JPMorgan's failure to prevent the

diversion by failing to shut down the account or to inform Musalli of the account withdrawals,

these omissions also do not rise to the level of substantial assistance because there was no

fiduciary relationship between the bank and Musalli.").  As this Court previously held, "BOA

had no affirmative duty to detect and thwart Cosmo's fraud. When a defendant has no such duty,

their failure to act may not serve as the basis for claiming that the defendant provided substantial

assistance."  Agape I, 681 F. Supp. 2d at 365.

Furthermore, the Court stated in Agape I that in order for the allegation that BOA shared

customer information with Agape to constitute substantial assistance, the Plaintiffs must allege

that "the Plaintiffs' account information had been shared with Agape" to satisfy the proximate

cause requirement for substantial assistance.  Id. (emphasis in original).  Although the Plaintiffs

supplemented this allegation in the Second Amended Complaints to identify Campagnuolo as the

individual who provided this information to Agape, they did not allege that she shared any of the Plaintiffs information with BOA. Without any allegation that BOA's sharing of customer information actually resulted in any of the Plaintiffs injury, the sharing of the information cannot constitute substantial assistance. Cf. Mazzaro de Abreu v. Bank of America Corp., 525 F. Supp. 2d 381, 392 (S.D.N.Y. 2007) ("Ignored advice is not substantial assistance in the achievement of an underlying fraud.")

The Plaintiffs allege two new allegations of substantial assistance with respect to Campagnuolo. First, they contend she provided substantial assistance as the default Controller of Agape. However, as previously noted, the Plaintiffs do not indicate any non-banking responsibilities in conjunction with this alleged responsibility. Furthermore, the Plaintiffs allege that:

> Campagnuolo, time and again, helped hold off angry investors and brokers, in order to forestall the scheme's collapse and discovery. She assuaged their concerns and falsely propped up the legitimacy of Agape. To do so, she made false and misleading statements with the goal of persuading investors to keep their money with Agape.

(SAC ¶ 72; Clarke SAC ¶ 172.) If true, this would certainly constitute substantial assistance. However, insofar as this is a fraud claim, the Plaintiffs were required to plead this allegation with specificity under Rule 9(b) by identifying the time, place, speaker, and content of the alleged misrepresentations. Although the Plaintiffs identify the speaker, Campagnuolo, they failed to provide any additional facts that would meet the specificity requirement of Rule 9(b). See, e.g., Dickens v. Chemical Bank, 573 F. Supp. 1129, 1133 (S.D.N.Y. 1983) (holding that an allegation that an employee of the defendant bank made "favorable statements" that mislead prospective investors failed to satisfy the particularity requirements of Rule 9(b) because the plaintiffs failed to identify the substance of the statements, when the statements were made, or the individuals to

whom they were made).   In fact, the only example the Plaintiffs do provide with the requisite specificity, which this Court previously held was insufficient to constitute substantial assistance, is an example where Campagnuolo cut a check for an investor to cash out of Agape.

Finally, in this regard, the Plaintiffs allege that BOA provided substantial assistance by recommending and implementing the Agape account structure and the RDS.  According to the Plaintiffs, the Agape account structure "facilitated the rapid flow of funds into the scheme and allowed Cosmo to quickly ramp up the scheme's revenues."  (SAC ¶ 60; Clarke SAC ¶ 160.) The Plaintiffs characterize the advice to set up the account structure as "highly unusual" and "extraordinary."  (SAC ¶ 61; Clarke SAC ¶ 161.)  However, the Plaintiffs offer no factual support for this characterization of the account structure and such conclusory allegations cannot satisfy the Plaintiffs burden of alleging substantial assistance with the requisite particularity. See Rosner I, 2008 WL 5416380, at *13.

In addition, with respect to the RDS, the Plaintiffs admit that it is not a unique product designed to facilitate the Agape fraud, but rather is a BOA service "that allows commercial customers to deposit large batches of checks from their own headquarters."  (SAC ¶ 62; Clarke SAC ¶ 162.) However, the Plaintiffs allege that the RDS constituted substantial assistance because it "sped the clearance of checks so that Cosmo could increase the size and scope of his Ponzi scheme by making funds available more quickly and without detection by tellers and others who may have raised red flags." (SAC ¶ 63; Clarke SAC ¶ 163.)  However, that Agape ultimately utilized the RDS to facilitate and conceal the fraud does not imply that BOA provided them with the service to accomplish that goal.

Furthermore, the Court notes that although the Plaintiffs contend that the RDS constituted substantial assistance based on Sullivan's involvement in recommending that BOA issue Agape

the RDS, the decision to provide Agape with the RDS required more than Sullivan's recommendation and approval. Pursuant to bank protocols, Agape had to undergo due diligence and obtain the sign-off, not only of Sullivan, but also of multiple risk officers. Although the Plaintiffs allege that Sullivan advocated for BOA to approve the RDS for Agape, there is no allegation that he attempted to persuade BOA to make a decision it otherwise would not have made. Renner II, 2000 WL 781081, at *9 (holding that an action taken by a bank employee was "[f]ar from concealing or assisting in the fraud" when the employee sought approval from other bank employees and did not attempt to persuade their decision). Furthermore, even assuming that it would violate BOA policy to provide Agape with an RDS, a "violation of an organization's internal policy with respect to financial transactions does not in and of itself constitute substantial assistance." Mazzaro de Abreu, 525 F. Supp. 2d at 391.

Ultimately, while the Plaintiffs have alleged that BOA's banking activities, structuring of the accounts, and issuance of the RDS made it easier for Cosmo to effectuate the scheme, these conventional banking transactions were not the proximate cause of the Plaintiffs' damages and therefore do not constitute substantial assistance. See Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 472 (S.D.N.Y. 2001) ("While the Ponzi scheme may only have been possible because of Bear Stearns' actions, or inaction, Bear Stearns' conduct was not a proximate cause of the Ponzi scheme.").

Accordingly, because the Plaintiffs have not met their burden of plausibly alleging that BOA had actual knowledge of the Ponzi scheme or provided substantial assistance, the Court grants BOA's motion to dismiss the claim for aiding and abetting fraud.

## C. As to Aiding and Abetting Breach of Fiduciary Duty

To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show: "(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach." Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009) (citation omitted). "A claim of aiding and abetting a breach of fiduciary duty is similar to a claim for aiding and abetting a fraud in that both causes of action require a plaintiff to allege actual knowledge, substantial assistance, and proximate causation." Agape I, 681 F. Supp. 2d 352, 366–67 (E.D.N.Y. 2010) (citing Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006)).

As discussed above, the Court finds that the Plaintiffs have not plausibly alleged that BOA had knowledge of the precise agreement between Agape and the Plaintiffs, and the scope of Agape's authority to invest under that agreement. It is well-recognized that "[a] depository bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation" and is instead entitled "to presume that the fiduciary will apply the funds to their proper purposes." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 287 (2d Cir. 2006).

Accordingly, because these facts in the Second Amended Complaints do not give rise to the inference that BOA knowingly participated in Cosmo's alleged breach of his fiduciary duties, the Court grants BOA's motion to dismiss the claim for aiding and abetting a breach of fiduciary duty.

**D.  As to Aiding and Abetting Conversion**

Although the Plaintiffs did not seek leave from the Court to assert a new cause of action as required under Federal Rule of Civil Procedure 15(a)(2), in the interest of judicial economy, the Court will nonetheless address the merits of this claim.

Aiding and abetting conversion requires the "existence of a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance." Kirschner v. Bennet, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009).  In cases where "the underlying wrong with respect to [the aiding and abetting conversion and aiding and abetting breach of fiduciary duty] claims is fraud, [actual knowledge] must also be alleged with particularity pursuant to Rule 9(b)." Silverman Partners, L.P. v. First Bank, 687 F. Supp. 2d 269, 286 (E.D.N.Y. 2010) (Spatt, J.).  "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."  Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 860 N.E.2d 713, 717, 827 N.Y.S.2d 96 (N.Y. 2006).

In the instant case, the Class Action Plaintiffs allege that through the "unlawful 'sale' of 'loan participations in real estate developments, [Cosmo and Agape] misappropriated and converted funds belonging to the plaintiffs and the class members."  (SAC ¶ 122.)  Similarly, the Clarke Plaintiffs contend that they invested money with Cosmo and Agape "for the particular purpose of engaging in legitimate investments in bridge loans, cash advances, and the purchase of insurance policies" and that Cosmo and Agape are liable for conversion because they used the funds for unauthorized purposes.  (Clarke SAC ¶¶ 306–07.)

Because these allegations of the underlying conversion "rests on an allegation of fraudulent taking" the claims against BOA for aiding and abetting conversion are subject to the

heightened pleading requirements of Rule 9(b).  <u>Daly v. Castro Llanes</u>, 30 F. Supp. 2d 407, 414

(S.D.N.Y. 1998) (holding that in cases where a conversion claim is premised on depositing funds

under a false pretense that the money would be handled in a prudent manner, the heightened

pleading requirements of Rule 9(b) apply); <u>see</u> <u>also</u> <u>Silverman Partners</u>, 687 F. Supp. 2d at 286.

Here, as discussed above, the Plaintiffs have not alleged facts that support a plausible

inference that BOA had actual knowledge of the scope of Agape's authority to invest the

Plaintiffs funds, or that Agape and Cosmo were committing the underlying alleged fraud.

Accordingly, even assuming this cause of action had been properly included in the Second

Amended Complaints, the Court finds the allegations insufficient to state a claim for aiding and

abetting conversion and therefore dismisses this claim.

### III.  CONCLUSION

The Court understands the Plaintiffs' frustration with the difficulty of plausibly stating an

aiding and abetting claim pre-discovery.  This concern was recently echoed by the Honorable

Richard B. Lowe III of the New York State Supreme Court in <u>CRT Investments, Ltd v. Merkin</u>,

2010 NY Slip Op 51868U, 29 Misc. 3d 1218A, 2010 N.Y. Misc. LEXIS 5282 (N.Y. Sup. Ct.

May 5, 2010), who, in dismissing claims against auditors for aiding and abetting a Ponzi scheme

stated:

> Finally, the court notes that these types of allegations of scienter
> against auditors of investment funds in these situations appear to
> be recurring, yet they cannot go beyond the motion to dismiss
> stage and into discovery under the present state of the law.  The
> inability to explore the alleged wrongdoing any further and
> potentially hold these parties accountable is frustrating to the court.

2010 N.Y. Misc. LEXIS 5282, at *44.

However, there is a reason that courts frequently note that "[t]he burden of demonstrating

actual knowledge, although not insurmountable, is nevertheless a heavy one." <u>Fraternity Fund</u>

Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007).  In the context of a Ponzi scheme, while the use of bank accounts plays an important role in facilitating and sometimes concealing the fraud, a bank account is only one part of what tends to be a large and intentionally complicated puzzle.  See Lawrence v. Bank of America, N.A.., No. 09-CV-2162, 2010 WL 3467501, at *4 (M.D. Fla. Aug. 30, 2010) ("Although Plaintiffs have alleged that BoA representatives had a 'general awareness' of certain pieces of the Diamond and DV puzzle, the facts alleged are not sufficient to give rise to a plausible inference that BoA had put the puzzle together, or even that it had enough of the pieces to do so.").

Accepting the well-pleaded allegations in the Second Amended Complaints as true, the Plaintiffs may have plausibly alleged that Bank of America was negligent or acted with disregard to the seemingly obvious signs that Agape was defrauding investors.  While this may highlight a need for greater oversight and accountability from financial institutions, it is not enough to overcome the hurdle of pleading that BOA plausibly had actual knowledge or provided substantial assistance to the Agape Ponzi scheme.

Accordingly, the Second Amended Complaints are hereby dismissed against Bank of America in their entirety, and the Clerk of the Court is directed to adopt the following caption in Clarke v. Cosmo, 09-CV-1782:

-------------------------------------------------------------X
ADRIANNE CLARKE, TL HORIZONS LLC,
MAXIMILIAN ENTERPRISES LLC and
EQUITY TRUST COMPANY CUSTODIAN
fbo Adrianne Clark IRA,

                                 Plaintiffs,
            -against-

NICHOLAS COSMO, AGAPE WORLD INC.,
AGAPE MERCHANT ADVANCE LLC,
AGAPE WORLD LLC, ANTHONY MASSARO,

DAVID PETRY, HUGO LEON ARIAS,
SEBASTIAN TAUZ, MARTY HARTMANN, SR.,
MARTY HARTMANN, JR., ELIZABETH
(last name unknown), LAURIE SAVARESE,
ALARON TRADING CORPORATION d/b/a
ALARON FUTURES & OPTIONS, XYZ CORPS 1-10,
 JOHN DOE 1-10, JANE DOE 8A, COMPANY 1,
COMPANY 2, and JOHN DOES 11-200,

                        Defendants.

 -----------------------------------------------------------X


**SO ORDERED**.

Dated: Central Islip, New York
March 29, 2011

                                    _/s/ Arthur D. Spatt_____
                                      ARTHUR D. SPATT
                                  United States District Judge